Filed 4/17/18

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E065757 |
| v. | (Super.Ct.No. FMB800402) |
| PATRICK LOWELL JACKSON, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  J. David Mazurek, Judge.  Reversed.

Rebecca P. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lynne G. McGinnis, and Kristine A. Gutierrez, Deputy Attorneys General, for Plaintiff and Respondent.

Patrick Jackson appeals his conviction and sentence for one count of lewd contact with a minor, arguing the trial court erroneously found him competent to stand trial before taking his guilty plea and again before sentencing him. After the trial court acknowledged a doubt about his competency and committed him to Patton State Hospital, numerous psychologists found him incompetent to stand trial and unlikely to be restored to competency because he suffers from a stable developmental disability—mild mental retardation—which limits his capacity for understanding and communication.

However, in early 2010, hospital staff changed their minds after drilling Jackson until he could answer simple, concrete questions about the judicial system. In February 2010, the trial court found Jackson competent based on their new report and then accepted his guilty plea. Before he could be sentenced, though, new psychological evaluations reported Jackson denied his guilt and did not understand he had pled guilty, and questioned the basis of the report finding him competent. In June 2010, the trial court found substantial evidence Jackson was incompetent.

Over a year later, and in the face of additional evaluations finding Jackson incompetent and unlikely to improve, the trial court again found Jackson was competent and sentenced him to three years in state prison. This time, the court based the competency finding on the contents of an evaluation Patton State Hospital staff had prepared nearly nine months earlier which simply copied the analysis from its early 2010 report and failed to address any of the concerns raised thereafter.

2

On appeal, Jackson argues neither his conviction nor his sentence can stand because neither competency finding was based on substantial evidence. We agree and therefore reverse the judgment.[1]

# I

## FACTUAL BACKGROUND

This case arose out of incidents in early August 2008 between Jackson and the 13-year-old grandson of a family friend. Jackson was swimming with the child in a pool at the mobile home park in Yucca Valley where he lived with his elderly mother. Jackson was giving the child a piggyback ride and asked the child to "hump his back." The two then went to the bathroom by the pool, and Jackson touched the victim's penis with his hand and said, "It's not growing. It's not growing." Later in the week, Jackson touched the victim's penis through his clothing while they were alone in a vehicle at a shopping center, and Jackson again mentioned the boy's penis was not "growing." On August 8, 2008, the victim told his grandmother, who reported the abuse to police.

A. *The Charges and First Finding of Incompetency*

The San Bernardino County District Attorney charged Jackson with two counts of lewd acts on a child. (Pen. Code, § 288, unlabeled statutory citations refer to this code.) On August 20, 2008, based on a request from the public defender, the court declared

---

[1] Jackson also appeals the court's restitution order and argues his counsel was ineffective. We need not reach those issues because we reverse his conviction and sentence on the ground the competency finding was not supported.

there was reason to doubt Jackson's competency and suspended criminal proceedings. (§ 1368.) The court ordered further proceedings to evaluate Jackson's competency, appointed Dr. Michael J. Perrotti to examine him, and set a hearing for September 17, 2008. (§ 1369, subd. (a).)

On the date of the hearing, defense counsel informed the court Dr. Perrotti had not yet examined Jackson and suggested substituting a June 20, 2008 competency report prepared by Dr. William H. Jones for proceedings in the Riverside County Superior Court. Dr. Jones found Jackson mildly mentally retarded, saying, "[i]ntellectually, he is at the level of a very young child, comparable to that of a 5 year old." Dr. Jones concluded, "[b]ecause of his very limited intelligence including very limited comprehension [Jackson] is not able to understand current proceedings and is not able to cooperate in a rational manner. Because of the developmental nature of his problems, treatment with antipsychotic medication is not going to help him, and his lack of mental competence is not changeable." Defense counsel provided the report to the court and the prosecutor and they discussed using it in the proceedings in San Bernardino. Ultimately, the prosecutor refused to stipulate to Dr. Jones's report and insisted on obtaining a report from Dr. Perrotti.

Dr. Perrotti too found Jackson had serious cognitive deficits. "He is unable to explain the process of a trial. He is unclear as to the roles of the principals, especially the district attorney. He is unaware of legal entities and their meanings, such as juries." Dr. Perrotti did find Jackson "is able to assist in his defense," because he is "able to

4

understand the nature of the charges against him." However, he found his cognitive deficits rendered him "unable to weigh legal options and the best legal options for himself. He is also unable to make prudent trial-related decisions. His thinking is concrete and primitive."

Dr. Perrotti concluded Jackson is "an intellectually limited man with a limited knowledge of the principals in the proceedings as well as the nature and process of a trial" and therefore "not competent to participate in legal proceedings at this time." He recommended placing Jackson in "special instruction" to ensure "the vocabulary and terminology is broken down into terms he can understand" using "repetitive audiovisual video material" because Jackson "does not possess the ability to understand complex concepts [or] retain complex bits of information."

Based on Dr. Perrotti's report, the trial court found Jackson to be incompetent to stand trial and referred him to the County Mental Health Director for a placement recommendation. On October 22, 2008, the trial court accepted the director's recommendation and sent Jackson to Patton State Hospital (Patton) for 180 days. The court ordered the director of Patton to make periodic written reports, the first due March 31, 2009.

B. *Attempts to Restore Competency at Patton State Hospital*

On March 9, 2009, Patton staff submitted a progress report. They wrote, "Since admission to Patton State Hospital, Mr. Jackson has received treatment consisting of a structured, supportive environment, individual therapy, medication regimen, and

5

treatment activities aimed at restoring him to competency and reduction of symptoms. Mr. Jackson'[s] initial response to treatment has been slow. His difficulties with written language have been ameliorated with more individual attention by staff members to help him learn verbally. Once his cognitive deficits have been ascertained and strategies to implement learning techniques are implemented, it is hoped that his response to treatment will optimize." They reported Jackson's "cognitive deficits obviously remain significant, and will be explored by neuropsychology consultants to ascertain the best methods of coping with them to facilitate learning of necessary court information."

The progress report concluded Jackson was not able to assist his attorney and did not adequately understand legal proceedings. The problem assisting his attorney stemmed from the fact that his "responses to questions and direction are not always consistent and coherent; he has a difficult time organizing complex concepts and evidences memory difficulties." Regarding court procedures, Jackson "has not correctly identified the four pleas available to him[,] . . . [has] not yet expressed a correct understanding of the possible consequences of each of the pleas[,] . . . has not correctly explained the nature of a plea bargain, and required prompting to identify the names and roles of the major courtroom participants." The report concluded, "it is the consensus of the Wellness and Recovery Team that [Jackson] is not yet competent to stand trial and should be retained for further treatment."

Defense counsel asked the court to order an updated progress report from Patton because the March 2009 report did not "appropriately address[] his issue of [Jackson's]

6

developmentally disabled condition." The trial court agreed, ordered Patton to submit a new competency report, and set a hearing for June 24, 2009. Patton's updated report said, "Psychological testing results suggest that Mr. Jackson suffers from significant intellectual deficits. He has demonstrated numerous weaknesses in comprehending and learning information presented both verbally and visually, as his test scores fall within the mild retardation range of adult intellectual functioning . . . He is unable to accurately complete even simple tasks, such as reciting the alphabet or solving basic mathematic calculations . . . He has a limited ability to memorize and recall information that is spoken to him, though he slightly benefits from repetition of information. His abstract reasoning is also poor, meaning that his thinking is concrete and simplistic."

The report also addressed whether Jackson's disability left room for him to become competent through treatment. The examiner concluded he "will likely have difficulty in gaining competency to stand trial," because his "cognitive limitations . . . may be a result of a biologically inherited intellectual disability . . . [meaning] he will have a limited ability to acquire and retain a factual understanding of court processes. In addition, he will have difficulty communicating with his attorney to assist in preparing and presenting his defense." The report noted Patton staff had given Jackson significant individual attention to help him overcome his cognitive deficit, to no avail. The report concluded, "there is no substantial likelihood that Mr. Jackson will regain competency in the foreseeable future."

7

On July 29, defense counsel said he was not willing to stipulate to the report's evaluation of Jackson and requested a competency trial. The court set a trial date for September, but later continued trial to December at defense counsel's request.

On September 16, 2009, the Patton staff submitted another status report, which reached the same conclusions. The report said Jackson still could not work with his attorney, noting he "continues to exhibit impoverished thinking and a childlike demeanor. He seems unable to effectively weigh options in problem solving or make an independent, well-informed decision." The report also discussed Jackson's continuing inability to understand the charges and legal proceedings he faced. "Mr. Jackson has been provided with more individual treatment sessions to increase his knowledge of court processes. When asked even basic questions about court he is easily confused and often replies, 'I don't know.' He demonstrates significant difficultly simply repeating information immediately after it is presented to him or remembering it over a period of time . . . Upon extensive guidance and prompting, he is unable to identify the specific charge against him, but he has given a basic description of the events related to the accusation." Though he showed "very small improvement" in understanding the roles of court officials and his plea options, "he is unable to identify specific terms, including public defender and district attorney. He continues to show no understanding [of] more complex concepts such as no contest, not guilty by reason of insanity, and plea bargaining . . . [and] has difficulty understanding different sentencing outcomes, such as

8

probation, a prison term or commitment to a hospital." The report concluded Jackson was not yet competent to stand trial and should be retained for further treatment.

C. *Delay for Competency Proceedings in Riverside County Superior Court*

All along, Jackson was enmeshed in similar proceedings in Riverside County, where he also faced charges of sexual misconduct. (See *Jackson v. Superior Court* (2017) 4 Cal.5th 96, 102 (*Jackson I*).) Jackson was never found competent in the Riverside case. (*Id.* at pp. 102-103.) Of most immediate relevance to this case, Jackson was being evaluated for competency in late 2009 and early 2010, and the San Bernardino trial court repeatedly delayed proceedings to await the outcome in Riverside.

At a status hearing on December 4, 2009, defense counsel informed the court Jackson would soon have competency proceedings in Riverside County and requested a continuance. "I don't know whether or not that will assist us in our case or not, but it is my request to continue this matter to the week after that so we can see if anything happens in that Riverside County case that may assist us in this case." The prosecution said, "I have no objection to that, your Honor. I think it would be in the best interest of both sides to know more." The court agreed and continued the hearing to December 18. The parties reconvened twice more and agreed to continue the hearing because proceedings in Riverside had been delayed.

Psychologist Michael E. Kania, Ph.D., examined Jackson on January 14, 2010 and submitted a report to the Riverside County Superior Court on January 22, 2010.[2] Dr. Kania's evaluation is consistent with the recent reports submitted in the San Bernardino case. "Mr. Jackson appears to be functioning within the range of mild mental retardation, which is consistent with the formal psychological testing completed by Dr. Jones in August 2008 and with the diagnosis at Patton Hospital at the present time . . . He is unable to name the President and he states that there are 'thirty-one and sometimes thirty' months in a year. He does not know how many days are in a week. He cannot complete simple addition or subtraction problems . . . His memory for distant and recent events is somewhat confused and simplified. Insight is absent. [¶] Diagnostically, Mr. Jackson is suffering primarily from mild mental retardation, which is a chronic condition."

Regarding his understanding of the case against him, Dr. Kania wrote, "Mr. Jackson is not clear about the present charge and only with pointed questioning is he able to give any indication of an awareness of this charge. He cannot state if the charge is serious or what the consequences might be. [¶] . . . [H]e is unable to define the role of his attorney, except that his attorney 'listens to what I got to say.' He cannot identify his attorney by name. He does not know the role of the district attorney or the jury. He is able to state that the judge would determine guilt or innocence and an appropriate

---

**2** We grant Jackson's request that we take judicial notice of Dr. Kania's report submitted to the Riverside County Superior Court (case No. INF061963), as well as our opinion in *Jackson v. Superior Court* (2016) 247 Cal.App.4th 767. (Evid. Code, §§ 451, subd. (a); 452, subd. (d).) Otherwise, we exercise our discretion and deny Jackson's motion.

10

sentence.  [¶]  When asked what he might do should a witness lie in court, Mr. Jackson states that he would 'sit there and listen.'  It is only with prompting that he states he would inform his attorney.  He is of the opinion that only the judge can advise him to testify in his own behalf."

Dr. Kania concluded "Mr. Jackson meets the legal criteria to be considered not trial competent at the present time, as a result of his developmental disability."  Dr. Kania also concluded "it is unlikely that he will ever be restored to competency, given that his incompetency is the result of a longstanding and significant intellectual deficit."  Dr. Kania noted, "This appears to be the opinion reached by Patton State Hospital staff with regard to the present charges in San Bernardino County."

The Riverside trial court apparently credited Dr. Kania's opinion, because it found Jackson incompetent to stand trial on February 3, 2010.  (*Jackson v. Superior Court*, *supra*, 247 Cal.App.4th at p. 770 & fn. 2, affd. *Jackson I*, *supra*, 4 Cal.5th 96 [noting the Riverside court found Jackson incompetent twice—on February 3, 2010 and again December 7, 2011].)  After waiting nearly two months to learn of this determination, however, the parties and the San Bernardino court ignored it entirely.

D.  *First Competency Finding*

Instead, the trial court found Jackson competent to stand trial exactly a week after the Riverside trial court found him incompetent.  The shift traces to a change of heart among the staff at Patton, for the day after the Riverside court found Jackson incompetent, the Patton medical director certified to the San Bernardino court that he had

11

regained competency and submitted a report recommending Jackson "be returned to court as competent to stand trial." (§1372, subd. (e).) Though filed February 4, 2010, the report is dated January 13, 2010 and it indicates Patton staff reached their conclusion after a consultation on December 16, 2009.

In the report, they wrote Jackson's "treatment program consists of a structured supportive environment, individual and group therapy, a psychotropic medication regimen, court preparation classes, and rehabilitation therapy activities." The report endorsed an evaluator's conclusions from an October 1, 2009 examination that Jackson "'has a poor understanding of the factual information regarding the adversarial nature of the courtroom. . . . does not appear to have a rational appreciation of the charges against him. . . . [but] appears to have the capacity to cooperate with his lawyer if he chooses to do so and understands proper courtroom behavior.'" The evaluator opined "[m]entally retarded individuals can learn information albeit at a much slower rate and depending o[n] the level of intellectual deficits," and recommended Jackson receive "individual assistance to solidify his knowledge of court concepts and procedures."

Consistent with that recommendation, Patton staff drilled Jackson in "intense individual and group treatment sessions to increase his knowledge of judicial terminology and procedures." According to the report, "when he is asked direct, open-ended questions about his legal situation, he is prone to immediately reply, 'I don't know.' However, when his legal situation is discussed in a more indirect manner (e.g., yes-no questions, in a game scenario, or referencing a hypothetical situation), he is able to

12

demonstrate basic knowledge required to assist in his defense. He is able to identify the charge against him and give a description of the events related to the accusation . . . He is not able to articulately describe the process of plea bargaining, but he believes it is 'when the court helps you to get a better charge so you go home, or not jail for a long time.' With further explanation by the treatment team, he shows a basic understanding of the purpose and outcome of plea bargaining . . . [H]e describes the judge's role as 'the boss of the court. He says if you spend more time or less time at jail.' He acknowledges that the prosecutor calls witnesses to 'talk against' him. He is aware that 'a witness talking and a camera' are forms of evidence. He is more knowledgeable about the possible sentencing outcomes, such as possible time in prison."

Overall, though, the report indicates Jackson made only limited advances between October and December 2009. Treatment group notes from that period indicate "he attends many of his groups but does not participate. He makes comments irrelevant to group discussion, such as complaining about the room temperature. He has also been noted to rarely talk in group and appear as though he may not be paying attention or learning the material. He often gives negative responses that are not objective when contributing to group discussions. Finally, in a group with this writer he was observed to be sleeping and making physical complaints. Despite his lack of focus in treatment, his inappropriate behaviors and anxiety have improved. Also, with much encouragement he is able to offer accurate responses when describing court processes."

13

The report says the Wellness and Recovery Treatment Team met with Jackson on December 16, 2009 to evaluate his progress. It noted the previous determination he was not competent was based on his "very concrete and primitive thinking" and his "intellectual limitations." The report concludes "[d]espite cognitive weaknesses," he has now "demonstrated adequate though rudimentary understanding of court processes . . . [and] is likely able to navigate the court process with increased support from his lawyer." The report also notes "his current intellectual ability is his baseline level of functioning and is not likely to improve with further treatment at a mental health facility such as [Patton]." Based on these facts, Patton staff recommended Jackson be returned to court as competent to stand trial.

On February 10, 2010, when the parties reconvened in the San Bernardino case, they made no reference to the proceedings in Riverside, Dr. Kania's evaluation, or the trial court's determination there that Jackson was incompetent. Instead, they simply took up Patton's new competency finding. The trial court said, "we are back because we do have a certification of mental competence for Mr. Jackson." The prosecutor said, "Your Honor, it does seem to indicate that he is now competent, and the People would submit on that." Defense counsel said, "I am prepared to submit on the doctor's recommendations," but noted "the doctors are indicating that they feel that his current intellectual ability is limited, but not likely to ever improve." The prosecutor responded, "for the record, that was my assessment, frankly, as well. I just don't think it rises to the

14

legal level." Based on the February 4, 2010 report, the trial court found Jackson had become competent and reinstated criminal proceedings.

E. *Jackson's Guilty Plea*

On February 24, 2010, Jackson entered a guilty plea to one count of violating section 288, with a promise of probation if he were found a suitable candidate for supervised release.

In taking his guilty plea, the trial court engaged Jackson in the following colloquy:

The Court: In order to enter a plea, you have to give up certain rights.

Defendant: If I'm still living – I'm not living at West Valley Detention Center.

The Court: Okay. We're going to figure all that out. I'm going to order you to go back to Patton till we sentence, all right. . . . First thing is I'm going to talk to you about the rights that you're going to give up. You do have a right to a preliminary hearing and the right to a trial by jury. At both of those proceedings you would be represented by an attorney, either one that you pick if you could afford it. In the event you couldn't afford an attorney, we would assign you one, an attorney like Mr. George. Then it doesn't cost you anything, okay. Through Mr. George you'd be able to confront and cross-examin[e] witnesses against you. He would be able to ask anybody that was accusing you of anything, any questions. He would be able to present evidence on your behalf. And subpoena witnesses to court. And you would have the right to either testify on your own behalf if you wanted to or just to remain silent. Do you give up those rights so that I can enter your plea today?

Defendant: Yes.

The Court: My understanding of the agreement in your case is that you're going to be pleading guilty to a violation of Penal Code Section 288(a), lewd act upon a child. That is punishable by up to a year in county jail, three, six, or eight years in state prison. You're doing that

15

|  |  | because the agreement is you're going to be placed on probation and serve 365 days in jail. . . . |
|---|---|---|
| Defendant: | | Yes, 365. |
| | | [¶] . . . [¶] |
| The Court: | | Did anybody promise you anything other than what's on this form to get you to plead today? |
| Defendant: | | No. |
| The Court: | | Anybody threaten you, beat you up, use any violence against you to get you to plead today? |
| Defendant: | | No. |
| The Court: | | Okay.  Are you under the influence of any alcohol, any drugs, any medications you're taking that you think affect your ability to understand what is happening? |
| Defendant: | | A lot of medicine has. |
| The Court: | | I'm sorry, what? |
| Defendant: | | A lot of medicine has. |
| The Court: | | Okay.  Do you feel like you understand what's going on today? |
| Defendant: | | Yeah. |
| The Court: | | Okay.  Do you feel like you've had enough time to talk to Mr. George about your case so that you know what you want to do? |
| Defendant: | | Yeah. |

Based on these responses, the trial court found Jackson understood the plea form, the nature of the charge, the consequences of punishment, and his constitutional rights, as well as that he knowingly, intelligently, freely, and voluntarily waived his constitutional rights.  The court then asked Jackson for his plea, and Jackson pled guilty.  The court accepted the plea and found Jackson entered his plea freely, voluntarily, knowingly, and intelligently, and found there was a factual basis for the guilty plea.

Finally, the court ordered the preparation of a psychological report evaluating the suitability of suspending Jackson's sentence despite his conviction for committing a lewd and lascivious act on a child under 14 years old (section 288.1 report).[3] The court told Jackson the acceptance of his guilty plea was "contingent upon the Court . . . refer[ring] your case for a report about you. And as long as there is a favorable report about you, then the Court will go along with that agreement. If the report is not favorable that you would be a suitable candidate that would be good for you to be on probation then I'll let you withdraw this plea, meaning we will take all this back if you don't have a good report, all right. If you do have a good report then the Court will put you on probation. You don't have to go to prison then."

F. *Reports on the Suitability of Supervised Release*

Jackson did not receive encouraging section 288.1 reports. One report found Jackson not suitable for parole. Another report found him suitable with supervision, but questioned his competence as well as Patton's approach to "restoring" competency. Both reports said Jackson denied his guilt.

Psychologist Jody A. Ward, Ph.D., emphasized Jackson's "complete lack of insight into his behavior." She wrote she asked him to share his side of the story about

---

[3] Section 288.1 provides, "Any person convicted of committing any lewd or lascivious act including any of the acts constituting other crimes provided for in Part 1 of this code upon or with the body, or any part or member thereof, of a child under the age of 14 years shall not have his or her sentence suspended until the court obtains a report from a reputable psychiatrist, from a reputable psychologist who meets the standards set forth in Section 1027, as to the mental condition of that person."

the accusations against him, and he responded "he never touched the boy." She "asked about riding the boy piggy back on his back and he would not answer. He was asked about the statements that he made to the boy about 'it's not growing.' He said, 'Eeeww! You're gross. I didn't say it.' He said he never knew this boy and did not know why he was being accused of this. He said the boy was not a boy and was 16 years old. The defendant stated that he was not guilty, and he did not plead guilty to this case the last time he was in court. He said, 'I didn't say nothing. I want to go home. I'm so upset right now.'" Dr. Ward indicated his lack of insight and the fact that he had acted in a sexually aggressive fashion on occasion at Patton made it likely he would re-offend. She concluded Jackson was not a good candidate for supervised release.

In a later report, Dr. Kania, who had evaluated Jackson for competency in the Riverside case, concluded Jackson's mother could supervise him and he was unlikely to re-offend. However, Dr. Kania raised significant problems with the finding that Jackson was competent in the first place. Dr. Kania wrote, "He appears to not understand that he has, in fact, pled guilty and he asks the examiner 'What do you mean, guilty? What does that mean?' With regard to the present charge, he states 'I didn't do it.'" Asked about the accusations against him, Jackson responded only, "That's nasty." Dr. Kania wrote, "Although you did not ask that I evaluate Mr. Jackson's trial competency, it became very clear during the course of the evaluation that he is, in my opinion, not trial competent. He seems to indicate a lack of understanding of the fact that he has pled guilty and the consequences of this plea."

18

Dr. Kania took issue with Patton's treatment plan for Jackson and its finding that he was competent. "At one point, the Hospital indicates that he is not likely to regain his competency as a result of his mild mental retardation and communication problems, but six months later the Hospital [finds] that he has, in fact, regained his competency, even though there had been no change in the aforementioned conditions. I also note that Patton gave Mr. Jackson a GAF [Global Assessment of Functioning score] of 35 [out of 100], suggesting an impairment in reality testing or communication (i.e., speech at times is illogical, obscure or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking, or mood. All of this would seem to significantly impair one's trial competency. Additionally, even though Patton opined that Mr. Jackson was trial competent, they also noted that he requires assistance to effectively weigh options and problem-solving and make well-informed decisions, that he responds to simplistic and concrete communication that is repeated to him <u>numerous times</u>. This would certainly suggest that he is not trial competent, and it is only when information is repeated 'numerous times' that he might be expected to learn this material. Whether he could understand it is another question."

G. *A Second Round of Competency Proceedings*

On June 28, 2010, the trial court held a status hearing and the court raised Dr. Kania's opinion that Jackson was not competent. The court concluded there was substantial evidence he was not competent, and again suspended criminal proceedings. The court also indicated it was concerned about Jackson's status in competency

19

proceedings in the Riverside case and referred the matter out for another competency report.

On July 28, 2010, the court received the new evaluation, this time from psychologist Chuck Leeb, Ph.D. Among other things, Dr. Leeb concluded Jackson "is not mentally competent enough to (A) understand the nature of the criminal proceedings which (B) makes him unable to assist counsel in a rational manner. [¶] . . . Mr. Jackson's incompetence is caused by a developmental disorder. By Patton's own testing, Mr. Jackson's IQ is 53. This places him in the extremely low range of intellectual functioning and in the bottom 1% of the population."

Dr. Leeb also concluded no intervention would make Jackson competent to stand trial. He concluded, "[t]here are no effective treatments. Mr. Jackson can never have his competency restored as he has never been competent to begin with. There is no way possible to restore something that one never had. [¶] Mr. Jackson's condition is permanent and stable . . . He will never be competent."

At a status hearing on July 11, 2010, the trial court asked the parties how they wanted to proceed. Defense counsel said Jackson was willing to stipulate to the report. However, the prosecutor refused and requested a competency trial. The court set a trial date for September 13, 2010.

However, before trial and with the consent of defense counsel and the prosecutor, the court referred Jackson to the Inland Regional Center (IRC) under section 1369, subdivision (a), which provides, "[i]f it is suspected the defendant is developmentally

20

disabled, the court shall appoint the director of the regional center for the developmentally disabled . . . to examine the defendant."

The referral to IRC ended up delaying the competency proceedings considerably. The court was forced to continue numerous scheduled hearings because of problems obtaining reports from the IRC. Ultimately, a psychological assessment from IRC determined Jackson did not qualify for services because, though he scored within the range of mental retardation, there was no evidence he had similarly low scores before age 18, a statutory prerequisite to obtaining services.

H. *Racing the Clock on the Maximum 3-Year Term of Commitment*

Finally, at a hearing on June 13, 2011, defense counsel argued Jackson had completed serving the maximum three-year term of commitment available under Penal Code section 1370, subdivision (c). The prosecution argued Jackson had been committed to Patton as incompetent for only 26 months because his commitment did not begin immediately on his arrest and he was declared competent for a period of a few months. The trial court agreed with defense counsel, but referred Jackson to be evaluated for a Murphy Conservatorship (Welf. & Inst. Code, § 5008, subd. (h)(1)(B)) on the ground he remained a danger to others.

On July 11, 2011, the court found Jackson did not qualify for a Murphy Conservatorship. But the court also reconsidered its determination Jackson already had completed the full three-year commitment. Relying on this court's recent decision in *People v. Reynolds* (2011) 196 Cal.App.4th 801, the court found the three-year limitation

21

on such commitments began running on the date of his transfer to Patton, January 2, 2009, could not be reduced by pre-commitment custody credits, and would therefore end on January 2, 2012.  At defense counsel's request, the court then set a competency trial date for August 29, 2011.

On that day, the parties returned to court and stipulated Jackson had been restored to competency.  They did so based on a Patton certification and report finding him competent from December 2, 2010—nearly nine months before the hearing.[4]  The December report reached the same conclusion as the earlier report submitted February 4, 2010 and supported its conclusion with evidence copied nearly entirely from the earlier report.

The new report duplicates almost verbatim the February 4, 2010 discussion of Jackson's knowledge and understanding of the charges and legal proceedings.  It even repeats the exact same quotations attributed to Jackson, which purported to demonstrate he had gained understanding despite his documented intellectual limitations.

So, the report repeats:

- "[W]hen he is asked direct, open-ended questions about his legal situation, he is prone to immediately reply, 'I don't know.'"

- He believes plea bargaining is "'when the court helps you to get a better charge so you go home, or not jail for a long time.'"

---

[4]  Patton had submitted another, nearly identical report on November 4, 2010.  We find no explanation in the record for why the parties and the court did not take these reports under consideration until August 29, 2011.

- He describes the judge's role as "'the boss of the court. He says if you spend more time or less time at jail.'"

- He says the prosecutor calls witnesses to "'talk against' him."

- He is aware that "'a witness talking and a camera' are forms of evidence."

These are the only pieces of evidence the report provides as support for its conclusion. The new report also repeats verbatim the earlier report's conclusion Jackson "is more knowledgeable about the possible sentencing outcomes, such as possible time in prison."

Like the earlier report, the new report said the Wellness and Recovery Treatment Team met with Jackson to evaluate his progress. Like the earlier report, it noted the previous determination Jackson was not competent was based on his "very concrete and primitive thinking" and his "intellectual limitations." And like the earlier report, the new report concludes "[d]espite cognitive weaknesses," Jackson has "demonstrated adequate though rudimentary understanding of court processes . . . [and] is likely able to navigate the court process with increased support from his lawyer," but notes "his current intellectual ability is his baseline level of functioning and is not likely to improve with further treatment at a mental health facility such as [Patton]." Based on these assertions—all copied from a report prepared 11 months earlier—Patton staff recommended Jackson be returned to court as competent to stand trial.

The December 2010 report did not address the fact that every other evaluation of Jackson found him to be incompetent. It did not address objections to the earlier report by Dr. Kania and Dr. Ward. Nor did it acknowledge Jackson had been found

23

incompetent in the Riverside trial court. The report simply duplicated its prior evidence, analysis, and conclusion.

Despite these deficiencies, the parties stipulated to the report's conclusion Jackson was competent. The court indicated it had read the December 2010 report, accepted the parties' stipulation, and found Jackson to be competent. "[T]he Court finds that the defendant is presently able to stand trial and that he is able to understand the nature of the cause and purpose of the proceedings, able to assist Counsel in his defense in a rational matter [*sic*]. Criminal proceedings are resumed." The court delayed sentencing, however, because the probation department did not accept the plea bargain's recommended sentence of 365 days in county jail and probation conditioned on a favorable section 288.1 report. Instead, they recommended Jackson be sentenced to six years in state prison.

At the sentencing hearing on September 9, 2011, the court told Jackson the section 288.1 reports were not favorable and the court would not follow the plea bargain. The court indicated it "would be okay with" a mitigated term as an alternative, "given what I know about the facts of the case and the significant mental issues with the case." The court said, "Mr. Jackson, you did have a plea agreement in this case that called for probation. It was contingent upon the 288.1 reports being favorable to you. [¶] As I interpret those, I don't necessarily see those as favorable for you. So you do have a right to withdraw your plea entirely and start over again if you want to. Or, the other option is that I can go ahead and sentence you to the mitigated term of three years. [¶] . . . So do

you want to go ahead and do that?" Jackson responded, "Yes," and the court imposed a three-year term in state prison, followed by a three or four year term of parole. Because Jackson had already served more than three years in custody, the court ordered his release and ordered him to report to parole, though with the understanding he may face a warrant in the Riverside case.

On December 9, 2016, Jackson filed an amended notice of appeal, seeking a certificate of probable cause to challenge his competency to plead guilty, which the trial court granted the same day.

## II

## DISCUSSION

Jackson challenges the trial court's orders finding him competent to stand trial. On February 10, 2010, the trial court found Jackson competent based on the contents of a psychological evaluation dated January 13, 2010 and filed February 4, 2010. After making the competency finding, the court accepted Jackson's guilty plea. On August 29, 2011, after having suspended criminal proceedings again, the trial court determined Jackson was competent based on the contents of a psychological evaluation dated December 2, 2010. Jackson argues neither his conviction nor his sentence can stand because neither competency determination was based on substantial evidence. We agree.

The due process clause of the Fourteenth Amendment to the United States Constitution and state statutory law prohibit the state from trying or sentencing a criminal defendant who is mentally incompetent. (§ 1367 ["A person cannot be tried or adjudged

25

to punishment or have his or her probation, mandatory supervision, postrelease community supervision, or parole revoked while that person is mentally incompetent"]; *Drope v. Missouri* (1975) 420 U.S. 162, 181; *Pate v. Robinson* (1966) 383 U.S. 375, 384-386; *People v. Ramos* (2004) 34 Cal.4th 494, 507.) "A defendant is incompetent to stand trial if he or she lacks a '"sufficient present ability to consult with his [or her] lawyer with a reasonable degree of rational understanding—and . . . a rational as well as a factual understanding of the proceedings against him."'" (*People v. Rogers* (2006) 39 Cal.4th 826, 846-847.)

"Both federal due process and state law require a trial judge to suspend trial proceedings and conduct a competency hearing whenever the court is presented with substantial evidence of incompetence, that is, evidence that raises a reasonable or bona fide doubt concerning the defendant's competence to stand trial. [Citations.] The court's duty to conduct a competency hearing may arise at any time prior to judgment." (*People v. Rogers*, *supra*, 39 Cal.4th at p. 847; see also § 1368.)

Once a defendant's competence has been called into question, "[t]he court shall appoint a psychiatrist or licensed psychologist . . . to examine the defendant," who "shall evaluate the nature of the defendant's mental disorder, if any, the defendant's ability or inability to understand the nature of the criminal proceedings or assist counsel in the conduct of a defense in a rational manner as a result of a mental disorder." (§ 1369, subd. (a).) "If it is suspected the defendant is developmentally disabled, the court shall appoint the director of the regional center for the developmentally disabled . . . to examine the

26

defendant. The court may order the developmentally disabled defendant to be confined for examination in a residential facility or state hospital." (*Ibid.*) "The regional center director shall recommend to the court a suitable residential facility or state hospital. Prior to issuing an order pursuant to this section, the court shall consider the recommendation of the regional center director. While the person is confined pursuant to order of the court under this section, he or she shall be provided with necessary care and treatment." (*Ibid.*)

Someone found to be incompetent may be involuntarily committed to determine if they are likely to regain competence. (§ 1370, subd. (a)(1)(B).) However, as our Supreme Court recently recognized in the case against Jackson in Riverside, "the duration of commitment may not exceed '"the reasonable period of time necessary to determine whether there is a substantial probability [they] will attain that capacity in the foreseeable future."'" (*Jackson I*, *supra*, 4 Cal.5th at p. 100.) The Legislature enforced that restriction by setting the maximum period of commitment at three years. (§ 1370, subd. (c); *Jackson I*, at p. 100.) "If at that point the defendant does not regain competence and is shown to be 'gravely disabled' within the meaning of the Landerman-Petris-Short Act [citation], then the court must order conservatorship proceedings . . . . [Citation.] Otherwise, the defendant is released." (*Jackson I*, at p. 100.)

Ultimately, the question of the defendant's competency shall be decided at a trial "by court or jury" and if by jury, it must be decided by unanimous verdict. (§ 1369, subds. (a) & (f).) The factfinder must presume "the defendant is mentally competent

27

unless it is proved by a preponderance of the evidence that the defendant is mentally incompetent." (§ 1369, subd. (f); see also *People v. Rells* (2000) 22 Cal.4th 860, 867.) We review the trial court's findings that Jackson was competent to stand trial for support by substantial evidence in the record—that is, for evidence that is reasonable, credible, and of solid value. (*People v. Marshall* (1997) 15 Cal.4th 1, 31.)

Here, substantial evidence does not support the trial court's findings Jackson was competent to plead guilty or to accept his sentence. We begin with the court's finding Jackson was competent at the time of his sentencing. We conclude, for several reasons, the basis for that ruling was essentially nil.

First, the hearing occurred on August 29, 2011 but staff at Patton prepared the supporting psychological evaluation nearly nine months earlier, on December 2, 2010. Every single evaluation of Jackson in this case concluded he was mildly mentally retarded, had extremely limited intellectual abilities, and had great difficulty grasping and retaining the legal concepts necessary for him to understand his legal circumstances and assist his attorney in his defense. Even the two reports in which Patton staff found Jackson had "regained" competency emphasized that he had a limited intellect, learned legal concepts only by rote, and responded accurately only if prompted with simple, targeted questions. For that reason, even if we were inclined to credit the December 2, 2010 report, it does not provide a sound basis for concluding Jackson retained any understanding he may have gained when he stood before the court nine months later to decide whether to maintain his guilty plea and accept a three-year sentence followed by a

28

period of parole. Given the unanimous opinion that Jackson had a chronic developmental disability that limited his ability to grasp and retain information, a report finding he understood his legal situation well enough to stand trial is not substantial evidence that he retained that understanding nine months later. Relying on it was error.

Second, the analysis of the December 2, 2010 report is even less relevant to the issue of competency in August 2011, because it actually came directly out of a report prepared 11 months previously. Recall the court found Jackson had regained competence on February 10, 2010 based on a Patton report filed February 4, 2010. Within a few months, however, the trial court found there was substantial evidence to conclude he was not (or no longer) competent. The December 2, 2010 report purported to provide reasons for finding he had since regained competence. However, the bulk of that report simply repeated the analysis contained in the February 4, 2010 report, which was prepared 11 months earlier. Thus, the trial court's evidentiary basis for finding Jackson competent in August 2011 came from an analysis prepared nearly 20 months earlier. As a result, Patton staff failed to provide the trial court with solid, reliable evidence of Jackson's competence as of August 2011.

Third, setting aside the issue of delay, Patton staff also failed to provide the trial court an evidentiary basis for finding anything had changed from when Dr. Kania (in June) and Dr. Leeb (in July) evaluated Jackson and found he was not competent. Patton's December 2, 2010 report does not mention the issues raised in those psychological evaluations, which questioned Patton's analysis and the prior competency

29

finding. The reports by Dr. Ward and Dr. Kania discussed in detail Jackson's denials of guilt and denials that he had pled guilty, which came only a few months after the court took his plea. Those reports at least raise the question whether Jackson in fact understood what had happened when he pled guilty. Patton's new evaluation should have addressed those concerns directly and the trial court should have demanded that Patton do so.

Moreover, the reports by Dr. Kania and Dr. Leeb specifically opined Jackson would never "regain" competency because his incompetency stems from chronic and stable mental retardation. To be "of solid value" and therefore constitute substantial evidence, any report reaching a contrary conclusion would at minimum have to address those criticisms and explain why hospital staff had come to a different result. The trial court, which possessed those earlier reports, could reasonably have concluded Jackson had regained competency only if presented with a report or other evidence that rebutted those criticisms. As the record stood on August 29, 2011, the trial court had every reason to conclude Jackson remained incompetent, and no solid basis for concluding otherwise. We therefore conclude it was error for the trial court to find Jackson competent in August 2011 as well as to accept his decision to maintain his guilty plea and accept a prison sentence.

What of the trial court's finding Jackson had regained competency as of February 10, 2010? Did Patton's February 4, 2010 report supply the trial court with substantial evidence to make that finding? Our answer again is no. It was the unanimous opinion of all the professionals who evaluated Jackson that he suffers from mild mental retardation

30

which severely limits his ability to understand the charges against him, the legal proceedings he faced, and his capacity to rationally assist his attorney. The same professionals, including staff at Patton, concluded repeatedly—over three years—that Jackson's condition was chronic and would not improve with treatment. So, in June 2008, Dr. Jones wrote "[b]ecause of the developmental nature of [Jackson's] problems . . . his lack of mental competence is not changeable." In June 2009, Patton staff wrote despite giving Jackson significant individual attention Jackson remained incompetent and "there is no substantial likelihood that Jackson will regain competency in the foreseeable future." In January 2010, Dr. Kania wrote, "it is unlikely that [Jackson] will ever be restored to competency, given that his incompetency is the result of a longstanding and significant intellectual deficit." And in July 2010, Dr. Leeb wrote "Jackson can never have his competency restored as he has never been competent to begin with. . . . [¶] Mr. Jackson's condition is permanent and stable. . . . He will never be competent."

Patton staff did not directly address the substance of these opinions. Instead, they decided to put Jackson through drills aimed at teaching him the rudiments of the judicial system. They wrote that despite his "innate, biological intellectual ability," "he has demonstrated adequate though rudimentary understanding of court processes." They noted, however, that "he requires assistance to effectively weigh options in problem solving and make well-informed decisions. He responds best to *simplistic, concrete communication* that is *repeated to him numerous times*." (Italics added.) They then point to the answers he was able to give their repeated, simplistic questions about plea

31

bargains, judges, prosecutors, and evidence as evidence that he had attained competency. We conclude the evidence that Patton staff drilled Jackson in how to answer the most basic questions about the judicial process and he learned to parrot the expected responses after numerous repetitions did not provide substantial evidence Jackson was competent to stand trial. As Dr. Kania opined, the fact Jackson could respond only to "simplistic and concrete communication that is repeated to him <u>numerous times</u> . . . suggest[s] that he is *not* trial competent," rather than the opposite. (Italics added.)

The People argue we should give weight to the fact that "[d]uring the plea colloquy, appellant responded appropriately to all of the court's questions and never said anything that would have caused the court to doubt [Jackson's] competency." We take no comfort from the colloquy. At the plea and sentencing hearings, the trial court treated Jackson like an ordinary defendant with a normal ability to comprehend the proceedings. The court posed stock explanations and questions to Jackson, which largely consisted of paragraph-long statements describing the rights Jackson would be waiving and the contents and consequences of his plea agreement followed by questions seeking his assent or dissent. But Jackson is not a typical criminal defendant. Every report by every professional who evaluated him concluded he had very limited abilities to comprehend and communicate complex information. Patton staff concluded he had an IQ of 53 and operated in the bottom one percent of the population, and found him competent to stand trial only on the basis of his ability to respond appropriately to repeated, simplistic questions. Faced with such a defendant, the trial court could not reasonably rely on

32

Jackson's responses to the standard plea colloquy as confirmation of his competency. (See *United States v. Masthers* (D.C. Cir. 1976) 539 F.2d 721, 728-729, overruled on another ground by *Godinez v. Moran* (1993) 509 U.S. 389 ["standard . . . colloquy may prove an inadequate measure of the validity of a plea proffered by a defendant of questionable mental competence"].)

An example from the colloquy at sentencing is illustrative. The court explained to Jackson his guilty plea had been "contingent upon the 288.1 reports being favorable to you" and told him "I don't necessarily see those as favorable for you." The court then explained he had "a right to withdraw [his] plea entirely and start over again if you want to. Or, the other option is that I can go ahead and sentence you to the mitigated term of three years. [¶] . . . So do you want to go ahead and do that?" Jackson responded, "Yes." But the trial court, having commented on Jackson's "significant mental issues," made no effort to explain what a section 288.1 report was, what it meant for his guilty plea to be "contingent" on a favorable report, or what it would mean for Jackson to "withdraw [his] plea entirely and start over again." It is unreasonable to think the man described in the psychological evaluations prepared in this case—a man who barely understood the concept of a plea bargain and has the intelligence of a five year old—could understand the complicated choice the court presented to Jackson. Thus, we conclude the trial court's exchanges with Jackson do nothing to prop up the court's competency findings.

Jackson asks us to go further and hold the trial court erred by finding him competent without obtaining the psychological evaluations and trial court rulings in the

33

Riverside case. We are not prepared to take that step. The trial court was required to base its competency determination on substantial evidence. If the report prepared and submitted by Patton staff had supplied substantial evidence, we would not reverse just because compelling contrary evidence existed. (E.g., *GHK Associates v. Mayer Group, Inc.* (1990) 224 Cal.App.3d 856, 872 ["In determining whether there is any substantial evidence to sustain the judgment, the appellate court will look only at the evidence supporting the prevailing party and will disregard the contrary showing"].)

We recognize obtaining additional information from the Riverside proceedings may have assisted the San Bernardino court, providing additional support for refusing to accept the Patton competency opinions. However, the bottom line is, the record in this case already contained so much compelling evidence of Jackson's incompetence and the Patton reports provided so little value, that additional information from the Riverside proceedings would have been cumulative.

### III

### DISPOSITION

We reverse the judgment.

CERTIFIED FOR PUBLICATION

SLOUGH _____

J.

We concur:

McKINSTER _____

Acting P. J.

MILLER _____

J.

34