Filed 10/13/20  P. v. Tooker CA1/1
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>CHARLES TOOKER,<br><br>        Defendant and Appellant. | A154181<br><br>(Marin County<br>Super. Ct. No. SC197709A) |

A jury convicted defendant Charles Tooker of attempted murder, criminal threats, and other crimes after he attacked his ex-girlfriend, M.A., and stabbed her with pruning shears.  The trial court sentenced him to 16 years in prison.  On appeal, Tooker raises a litany of claims, including that the court erred in (1) finding he was competent to stand trial; (2) admitting evidence of his prior domestic violence under Evidence Code section 1109, and giving a related jury instruction about that evidence; (3) failing to give a jury instruction on the defense of unconsciousness; and (4) giving a jury instruction on attempted voluntary manslaughter.  He also claims that Penal Code section 422, the criminal-threats statute, is unconstitutionally vague; that a remand is necessary for a consideration of his eligibility for mental health diversion under Penal Code section 1001.36, which went into effect after he was sentenced; and that the court erred by imposing certain charges

1

without a determination of his ability to pay them, in contravention of *People v. Dueñas* (2019) 30 Cal.App.5th 1157.[1]

This court rejected Tooker's claims and affirmed the judgment on December 9, 2019. (*People v. Tooker* (Dec. 9, 2019, A154181) [nonpub. opn.].) The following month, Tooker filed a petition for review in the California Supreme Court raising several claims, including that this court should have conditionally reversed and remanded the case for a determination of his eligibility for mental health diversion. In March 2020, the Supreme Court granted the petition and deferred further action pending its decision in *People v. Frahs*, S252220.

The Supreme Court filed its decision in *Frahs* in June 2020, holding that section 1001.36 applies retroactively to all defendants whose judgments were not yet final at the time the statute took effect and that the appropriate disposition is generally to conditionally reverse a defendant's convictions and remand for the trial court to consider whether to place the defendant on mental health diversion. (*People v. Frahs* (2020) 9 Cal.5th 618, 624–625, 640–641 (*Frahs*).) In so holding, the Supreme Court rejected the Attorney General's argument that remand would be futile in that case "because the trial court [had] already made findings that cast [the] defendant as unsuitable for diversion," including a finding under California Rules of Court, rule 4.423(b)(2), that the defendant was not " 'suffering from a mental . . . condition that significantly reduced culpability for' his crimes." (*Frahs*, at p. 638, quoting Cal. Rules of Court, rule 4.423(b)(2).)[2]

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

[2] All further rule references are to the California Rules of Court.

On August 26, 2020, the Supreme Court remanded Tooker's case to us with directions to vacate our prior decision and reconsider the matter in light of *Frahs*. In supplemental briefing, Tooker argues that our prior reliance on the trial court's finding under rule 4.423(b)(2) to conclude that remand was futile was incorrect under *Frahs*. The Attorney General effectively agrees, but he argues that we can still conclude remand would be futile for a different reason left open by *Frahs*: that "the record clearly indicates the trial court would have found the defendant 'pose[s] an unreasonable risk of danger to public safety' " under section 1001.36, subdivision (b)(1)(F). (*Frahs*, *supra*, 9 Cal.5th at p. 640.) But we rejected this basis for futility in our previous opinion, and *Frahs* gives us no reason to reconsider our analysis on this point.

Accordingly, we vacate our decision of December 9, 2019, conditionally reverse the judgment, and remand for the trial court to consider in the first instance whether Tooker is eligible for mental health diversion under section 1001.36. If the court denies diversion, Tooker shall also have the opportunity on remand to raise his claim that he does not have the ability to pay certain charges. The Supreme Court's order does not affect any other aspects of our previous decision, and we therefore reach the same conclusions as to the other claims Tooker raises.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

A.    *Tooker's Relationship with M.A.*

Tooker and M.A. began dating at the end of 2009, when they both lived in Ohio. M.A. testified that she and Tooker "weren't compatible" and "it had always been a violent relationship on both sides." Tooker, who testified in his own defense, agreed that the relationship was volatile and they were

3

"psychologically assaultive towards each other," but he claimed that M.A. was always "the physical aggressor."

M.A. testified that Tooker hit her for the first time in November 2011, after they went to a football game in Cincinnati. They had been "drinking heavily," and M.A. could not find her cell phone. She became upset because the phone had her niece's baby pictures on it, and Tooker told her "to get over it." When she and Tooker returned to their hotel room, he pinned her down, she "kicked him in the crotch to get him off [her]," and he punched her in the nose, breaking it. But according to Tooker, M.A.'s kicking of him was unprovoked, and she hurt her nose after she threatened to jump out the window and slipped on the windowsill.

About a year later, in November 2012, M.A. and Tooker moved to California. At the end of that month, they began living in a San Rafael apartment rented by M.A., who was working as a pharmacist. The two had been fighting before they arrived in San Rafael, but M.A. thought they had "kind of settled it." But soon after, while she was at work in Placerville, she received a call from the Marin Humane Society saying that her dog was there. She was unable to reach Tooker by phone, so she went back to San Rafael and picked up the dog, who was microchipped but had been "let loose without a collar." M.A. testified that when she returned to her apartment, the windows were smashed out, the walls were damaged, and "it was totally trashed." Tooker admitted to her that he had caused the damage, which totaled approximately $30,000, and apologized for his issues with anger and alcohol.[3] Soon afterward, he moved back to Ohio, but he and M.A. remained in a long-distance relationship.

---

[3] Tooker testified that he caused the damage because he was mad that he and M.A. "weren't carrying out the agreements that [they] had," including to stay sober, but he did not contradict her testimony about the event.

4

In August 2013, Tooker moved back to California, and he stayed with M.A. while he looked for an apartment. A few weeks after arriving, he hit M.A. again, precipitating the end of their relationship. The two had driven to Berkeley to shop, and M.A. had to take a work call and was gone for about 10 minutes. When she came back, Tooker, who had been drinking throughout the morning, was "agitated." He got into the car, hit M.A., and directed her to drive home. She testified, "So I started to drive home, and then he started smacking my head against the driver side door window as I was driving over the Richmond Bridge[,] saying he's going to kill me, he's going to kill my mother, and then repeatedly smacking my head against the window." Tooker also threw her personal and business cell phones out the window while they were still on the freeway. M.A. sustained two black eyes and bruising as a result of the incident.

Tooker agreed that he was upset that M.A. had taken a work call, but he claimed that the fight began because M.A. was drunk and texting as she was driving. When he became concerned that they were "swerving" and asked her to get off her phone, "[s]he reached over [and] . . . whacked [him] in the face with the phone." She then threw the phone at him, and he tossed it out the window. According to Tooker, M.A. resumed texting on her other phone, which he grabbed and tried to throw out the window. Attempting to stop him, she "whacked her face on the rearview mirror console in her car," causing her injuries.

After the August 2013 incident, M.A. told Tooker that the relationship was over. But Tooker threatened to kill himself if M.A. stopped talking to him, and they continued to communicate by phone and text message. He began sending her "hundreds" of text messages a day, including some

threatening her, but they stopped later that month. As it turned out, Tooker had been hospitalized on August 26 after sustaining a traumatic brain injury.

When Tooker got out of the hospital, he resumed sending text messages to M.A. She testified that although the messages were initially "loving," they became threatening when she did not respond. As a result of this harassment, she eventually changed her personal and business email addresses and cell phone numbers. After Tooker posted suggestive photographs of M.A. online, she "knew that he was serious about all of the threats he said he was going to do to [her]," so she obtained a restraining order against him in April 2014. The restraining order prohibited him from coming within 300 feet of her, her dog, and her property.

Tooker's stalking behavior persisted, however. In the spring of 2015, an anonymous letter was sent to M.A.'s employer claiming that M.A. "was driving [her] company car drunk, smoking marijuana, snorting cocaine." M.A. testified that she suspected Tooker had sent the letter, based on its "[w]riting patterns and styles, abbreviations that he would always use, and just the writing style." Tooker also "created fake Russian women profiles on Facebook to contact [her]" and contacted her sister several times.

### B. The Charged Attack

Tooker testified that he had serious difficulties after his brain injury and became homeless in the spring of 2016. About two months later, in mid-June, he decided to ride his bicycle "up the coast north toward Portland, ultimately," although he did not bring either a tent or any food. He admitted to looking up M.A.'s address "out of great curiosity," and he decided to ride by her house on his way north for "closure." He also brought a gun, which he

explained he had originally given to M.A. as a gift but kept after the relationship ended.

M.A. testified that at around 10:45 a.m. on June 18, 2016, she was gardening outside her house. Her dog was with her. As she turned to go inside, she saw a man standing in her backyard. Thinking he was a friend of hers, she greeted him, but the man "didn't say anything back, and he was just staring at [her] with a smug like FU look on his face." The man then said, "Keep your mouth shut, . . . I'm here to kill you," and she recognized him as Tooker. M.A. explained that she did not initially recognize Tooker, whom she had not seen in almost three years, because "[w]hen [she] dated him, he had a very short haircut, clean cut, no beard, and when [she] saw him that day, he had very long hair, scraggly man bun, hair disheveled out of it, really long beard."

M.A. testified that after Tooker threatened to kill her, he pulled a gun from his pocket. She recognized it as the gun he had bought for her while they lived together in Ohio. She told him he needed to leave because of the restraining order, which was still active, but he again told her to be quiet and said he was there to kill her. He then ordered her to drop the pruning shears she was holding, which she did "out of instinct." But when he directed her to a corner of the yard, she picked up the pruning shears and ran toward the yard's back gate, which was padlocked.

As M.A. tried to climb over the gate to escape, Tooker grabbed her shirt and pulled her to the ground, where she landed on her back. M.A. testified that she was repeatedly screaming, "He's got a gun. He's going to kill me." Tooker slammed her head on the ground and, after a struggle during which she ended up on her stomach, he stabbed her with the pruning shears about eight times in the back of her neck and head. She testified that as the

7

struggle continued, she was able to grab the pruning shears from him. In trying "to stab him to get him off of [her]," she ended up on her back again. Tooker pinned M.A. and began strangling her with both his hands.

That morning, K.H. was with his daughter at her softball pitching lesson at the home of W.G., a neighbor of M.A.'s. During the lesson, the two men heard "high-pitched screaming" that sounded "terrified." They ran out to the street, at which point K.H. could hear a dog barking and a woman screaming, "He's killing me." Another neighbor who had also come outside called 911.

K.H. ran down the street to M.A.'s fence but could not see through it, so he jumped over it into her yard. Once he landed, he "saw a woman on the ground with a man on top of her with both hands on her throat, . . . [c]hoking her." K.H. kicked Tooker to "knock him off" M.A. and then "wrestled him to the ground and held him there." Meanwhile, W.G. was able "to rip the fence open" and enter the yard. After determining that K.H. had successfully subdued Tooker, W.G. went to help M.A., who initially appeared unconscious but then began screaming again. W.G. asked Tooker, "What the F were you thinking?" Tooker responded, "I'm her ex-boyfriend[.] . . . She's ruining my life."

After W.G. calmed M.A. and determined that her wounds were "pretty severe" but "not life threatening," M.A. told him that Tooker had stabbed her and he had a gun. W.G. ran over to Tooker and screamed at him, "She said you have a gun. Where is the F-ing gun?" Tooker responded that it was in his pocket, and he let K.H. pull an empty holster from his pocket. At that point, a Marin County Sheriff's deputy arrived and quickly located the gun by

the fence.  It was unloaded and locked so that the hammer could not be pulled back.[4]  A live round was located under Tooker's leg.

M.A. was taken to the hospital after the attack.  She had sustained stab wounds, bruising from her fall from the fence and the strangulation, and other cuts and bruises from the struggle, and one of her head wounds required stitches.  She testified that she was in pain for several weeks after the attack and has significant scarring, as well as continuing pain from nerve damage.

Tooker testified that he had not planned to stop at M.A.'s house, and he did not know why he entered her backyard.  He claimed that what happened next was "very sketchy" and "quite hazy," and on direct examination he testified that his "last very clear memory" was hearing M.A.'s dog bark as he rode his bicycle by her house.  He remembered M.A. "swinging the shears at [him]," but he did not recall stabbing or choking her.  On cross-examination, he acknowledged remembering additional details, including that M.A. had tried to climb the fence but fell and that he was on top of her, but he specifically denied stabbing or strangling her.

C.     *Tooker's Plan to Prevent M.A. from Testifying*

After his arrest, Tooker was incarcerated at the Marin County Jail.  Around November 2016 he became friendly with R.D., another inmate.  According to R.D., Tooker said he was charged with the attempted murder of his ex-girlfriend, and they discussed a plan to stop her from testifying.[5]  As described by R.D., "We discussed first it would be a phone call.  If the phone

---

[4] The gun's locking mechanism could be unlocked only by a hex key.  No such key was found in Tooker's belongings, and Tooker testified that he always kept the gun locked and no longer knew where the key was.

[5] R.D., who admitted that he had been convicted of numerous crimes dating back to 2004, testified under a grant of immunity.

call didn't work, I was supposed to have [E]psom salt and hamburger to throw over the fence to [M.A.'s] dog . . . to make him sick[,] . . . to let her know that I wasn't fucking around when I made the phone call, to prove that I'd been there once before, to know that I knew where she was." Tooker also sent R.D. a note instructing him "to do whatever [he] felt was necessary" if the phone call did not work, which R.D. interpreted to mean killing M.A.

R.D. agreed to call M.A., for which he was to receive a "down payment" of a $300 EBT card and the balance in artwork that Tooker supposedly had in storage in Ohio. The two men scripted the phone call, which had R.D. representing himself as someone from M.A.'s company who "needed a certain drug" and wanted to speak to her. Tooker also gave R.D. a map of M.A.'s house and directions on how to Google her address. R.D. received the EBT card from Tooker's brother and was released in February 2017, but he did not follow the plan because he "didn't feel comfortable with it." Eventually, R.D. reported the plan to law enforcement.

Tooker denied that he had "engage[d]" R.D. to threaten M.A. Rather, Tooker claimed that R.D. had stolen the $300 from him and that the notes between them, several of which were introduced into evidence, reflected "a proposed movie script . . . based on the book *Gone Girl*" that R.D. wanted his help in writing.

### D.     *The Verdicts and Sentencing*

The jury convicted Tooker of felony counts of attempted murder, criminal threats, assault with a deadly weapon (pruning shears), assault by means likely to cause great bodily injury (strangulation), and corporal injury on a former dating partner, and a misdemeanor count of violation of a

10

domestic relations court order.[6]  It also found true, as to the convictions for attempted murder, strangulation-based assault, and corporal injury, the allegation that Tooker personally inflicted great bodily injury under circumstances involving domestic violence, and, as to the criminal-threats offense, the allegation that he personally used a firearm.[7]  But the jury found not true the allegation that the attempted murder was deliberate and premeditated.[8]

The trial court sentenced Tooker to a total term of 16 years in prison, composed of a term of nine years for attempted murder and consecutive terms of five years for the great-bodily-injury finding as to the attempted murder, eight months for criminal threats, and one year and four months for the great-bodily-injury finding as to the criminal threats.  Four-year terms for both assault convictions and the corporal-injury conviction were imposed and stayed, and a one-year county jail term for the court-order violation was imposed and deemed served based on custody credits.

---

[6] The convictions were under sections 187, subdivision (a), and 664 (attempted murder), 422 (criminal threats), 245, subdivision (a)(1) (assault with deadly weapon) and (4) (assault by means likely to cause great bodily injury), 273.5, subdivision (a) (corporal injury on dating partner), and 273.6, subdivision (a) (violation of court order).

[7] The great-bodily-injury allegation was found true under section 12022.7, subdivision (e)(1), and the personal-use allegation was found true under section 12022.5, subdivision (a).

[8] The premeditation allegation was made under section 664, subdivision (a).

II.

## DISCUSSION

*A.*   *There Was Substantial Evidence of Tooker's Competence to Stand Trial.*

Tooker claims that insufficient evidence supported the trial court's determination that he was competent to stand trial, violating his due process rights.  We are not persuaded.

### 1.   Additional facts

In August 2016, well over a year before trial, Tooker's original trial counsel asserted his belief that Tooker was incompetent because he was unable to assist in his own defense.  Counsel did so as his relationship with Tooker was disintegrating, prompting multiple *Marsden*[9] motions and counsel's eventual withdrawal from the case.  The trial court suspended the proceedings, ordered a competency hearing, and appointed a psychiatrist and a psychologist to evaluate Tooker.

The following month, the appointed psychiatrist, Martin Blinder, M.D., submitted a report and supplemental report concluding that Tooker was competent, and the appointed psychologist, Mary Ann Yaeil Kim, Ph.D., submitted a report concluding that Tooker was not competent.  The reports were primarily based on in-person examinations of Tooker, though both doctors also reviewed his medical records and information about the crimes he committed.

Dr. Blinder diagnosed Tooker with "[s]talking (erotomania)," "[e]ncephalopathy secondary to traumatic brain injury, largely recovered," "[s]ubstance dependency in institutional remission," and "[o]bsessive-compulsive personality."  After Dr. Blinder explained that he had "put

---

[9] *People v. Marsden* (1970) 2 Cal.3d 118.

12

considerable effort into ensuring that [Tooker was] comfortable, non-defensive, and quite frankly, [found the doctor] likeable," he opined,

> "[A]t Mr. Tooker's best, there is no question that he is entirely competent in every legal definition of that word. At his worst, not so much. Particularly when he finds himself at this crucial moment in his life, entirely dependent upon an attorney with whom he does not see eye to eye, his ability to rationally collaborate with counsel in the preparation of a defense can 'go south' in a hurry.
>
> "But as the court knows, 'competence' is less a relationship issue than an objective clinical measure of the degree to which an individual is cognitively able to understand the nature of the charges, follow the contours of the legal road ahead, and if he so chooses, collaborate with counsel. Once Mr. Tooker 'felt good' about me he exhibited no 'mental disease or defect' . . . that would substantially interfere with his ability to do any of these things. . . . In short, alcohol and drug addiction, cerebral encephalopathy, and personality quirks notwithstanding, this gentleman is legally and clinically entirely equal to his day in court."

In his supplemental report, Dr. Blinder offered an additional diagnosis of antisocial personality disorder, which did not change his "fundamental conclusions that if [Tooker] so chooses, [he] is entirely competent to go forward with a trial."

Dr. Kim, on the other hand, determined that Tooker was not "trial competent due to a severe personality disorder," which she characterized as "Paranoid Personality Disorder." She believed that he was able to understand the proceedings, but he was not "able to cooperate in a rational manner with counsel" due to his "pervasive distrust and suspiciousness of others." Dr. Kim also concluded that Tooker "would not be able to prepare and conduct his own defense in a rational manner with or without counsel.

13

This is something Mr. Tooker admits himself, he does not know how to defend himself."

In October 2016, after the parties agreed that the issue of Tooker's competency could be decided based on the doctors' reports, the trial court ruled that Tooker was competent and reinstated criminal proceedings. Explaining its reasoning, the court stated,

> "I've read these reports very carefully and they do reach different conclusions. However, I believe that one report is so much stronger and substantiated in its conclusion than the other. One is very strong and contemplated and done by a medical doctor who did a very thorough and persuasive analysis on the defendant and reached clinical decisions that both are sound, as far as the Court can tell from these reports, and make sense in the context of the reasoning. That's Dr. Blinder's report. He concludes that the defendant is competent.
>
> "The other report by Ph.D. Kim is uncomfortably superficial, has no real substantive analysis in terms of what mental disorders the defendant would be suffering from that would afflict him here, essentially is unpersuasive in its conclusion, that report concludes the defendant is not competent, but I don't think that that report is well founded, particularly in the context of Dr. Blinder's report."

### 2. Discussion

A defendant who, "as a result of mental disorder or developmental disability, . . . is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner" is not competent to stand trial. (§ 1367, subd. (a); *People v. Ramos* (2004) 34 Cal.4th 494, 507.) Federal due process and state statutory law prohibit the trial or conviction of a mentally incompetent defendant. (*Ramos*, at p. 507; *People v. Jackson* (2018) 22 Cal.App.5th 374, 391.) The key issue is whether the defendant has " ' " 'sufficient present ability to consult with his [or her] lawyer with a reasonable degree of rational understanding' and 'a

14

rational as well as factual understanding of the proceedings against him [or her].' " ' " (*Ramos*, at p. 507.)

A defendant is presumed competent unless proven otherwise by a preponderance of the evidence. (§ 1369, subd. (f).) "On its face, the statutory scheme does not expressly impose the burden of proof on any specific party. Rather, the presumption of competency operates to place the burden of proof on the party claiming the defendant is incompetent." (*In re R.V.* (2015) 61 Cal.4th 181, 189.) We review a trial court's determination that a defendant is competent for "substantial evidence in the record—that is, for evidence that is reasonable, credible, and of solid value." (*People v. Jackson, supra*, 22 Cal.App.5th at p. 392.)

As Tooker recognizes, one of the experts concluded that he could assist counsel in his own defense, which would normally constitute sufficient evidence of competency in this respect. Nevertheless, Tooker contends this was a "perfunctory conclusion" that Dr. Blinder "tellingly prefaced . . . with several observations that contradicted [it]." According to Tooker, Dr. Blinder "chose . . . to assess [him] at his best," yet the doctor also recognized that his "ability to rationally collaborate with counsel in the preparation of a defense can 'go south' in a hurry." Tooker claims that this amounted to a finding that "he was unable to properly consult with counsel and assist in his defense," echoing Dr. Kim's conclusion.

We disagree with Tooker's interpretation of Dr. Blinder's conclusion. Dr. Blinder recognized that Tooker's relationship with counsel would affect Tooker's level of cooperation, but he then explained that " 'competence' is less a relationship issue than an objective clinical measure of the degree to which an individual is cognitively able to . . .[,] if he so chooses, collaborate with counsel. Once Mr. Tooker 'felt good' about me he exhibited no 'mental disease

15

or defect' . . . that would substantially interfere with his ability to do [this]." In other words, Dr. Blinder opined that Tooker might *choose* not to cooperate if he did not like counsel, but he was cognitively able to do so. This constituted substantial evidence that Tooker was able to assist counsel in conducting a rational defense (§ 1367, subd. (a)), defeating this claim.

> B. *Tooker's Claims of Error Involving the Evidence of Prior Domestic Violence All Fail.*

Tooker claims that the trial court improperly admitted evidence of other acts of domestic violence under Evidence Code section 1109 (section 1109) because that statute is unconstitutional, as well as because the evidence should have been excluded under Evidence Code section 352 (section 352). He also claims that CALCRIM No. 852A, the jury instruction on evidence admitted under section 1109, upsets the presumption of innocence. These claims are unpersuasive.

> 1.     Additional facts

Before trial, the prosecution sought to introduce evidence of Tooker's past acts of domestic violence against M.A. on two occasions: the 2011 incident at the Ohio hotel, and the 2013 incident on the Richmond/San Rafael Bridge. Tooker objected that the evidence was unduly prejudicial under section 352 because he was not convicted for this behavior.

The trial court concluded the evidence qualified for admission under section 1109 and should not be excluded under section 352. The court found that both incidents were "highly relevant" and not remote, since they had occurred within five years of the charged attack. The court also determined that presenting evidence of them would not involve an undue consumption of time, since both involved M.A. and would not require testimony from other witnesses.

16

The trial court gave a modified version of CALCRIM No. 852A, the form instruction on evidence of uncharged domestic violence. In pertinent part, the instruction informed the jurors that if they found by a preponderance of the evidence that Tooker committed the prior acts, they could, but were not required to, "conclude from that evidence that the defendant was disposed or inclined to commit domestic violence and, based on that decision, also conclude that the defendant was likely to commit and did commit all [*sic*], as charged here."

> 2.     General legal standards

Section 1109 provides, with certain inapplicable exceptions, that "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by [Evidence Code] Section 1101 if the evidence is not inadmissible pursuant to Section 352." (§ 1109, subd. (a)(1).) Evidence Code section 1101, in turn, generally prohibits the admission of "evidence of a person's character or a trait of his or her character . . . when offered to prove his or her conduct on a specified occasion," which we will refer to as propensity evidence. (Evid. Code, § 1101, subd. (a).)

We review a trial court's admission of evidence under section 1109 for an abuse of discretion. (*People v. Poplar* (1999) 70 Cal.App.4th 1129, 1138.) Tooker's claims involving the statute's constitutionality and the correctness of CALCRIM No. 852A present legal questions we review de novo. (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088; *People v. Mayo* (2006) 140 Cal.App.4th 535, 553.)

> 3.     Tooker's constitutional claims fail under governing precedent.

In *People v. Falsetta* (1999) 21 Cal.4th 903, the Supreme Court rejected a due-process challenge to Evidence Code section 1108 (section 1108), which

17

authorizes the admission of propensity evidence in sex-offense cases. (*Falsetta*, at p. 907.)  In holding that the statute was constitutional, the Supreme Court emphasized that section 352 functioned as a safeguard against the risks of judicial inefficiency and undue prejudice that arise from introducing propensity evidence.  (*Falsetta*, at pp. 916–917.)  Given that section 1108 and section 1109 are nearly identical, numerous Courts of Appeal have relied on *Falsetta* to reject due-process challenges to the latter statute.  (*People v. Cabrera* (2007) 152 Cal.App.4th 695, 704 [collecting cases].)  As Tooker concedes, we are bound to follow *Falsetta* as controlling precedent, and we therefore will not entertain his arguments involving whether that case was wrongly decided.  (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Tooker also argues that section 1109 violates equal protection because it treats defendants charged with domestic violence offenses differently than other similarly situated individuals.  Division Three and Division Four of this court rejected the same claim in *People v. Jennings* (2000) 81 Cal.App.4th 1301 and *People v. Price* (2004) 120 Cal.App.4th 224 respectively, and Tooker offers us no reason to depart from these decisions' reasoning.  His argument is premised on the contention that section 1109 violates due process, meaning that strict scrutiny should be applied to determine whether it also violates equal protection, but as discussed above we are bound to conclude that the statute does not violate due process.  Therefore, this constitutional challenge fails as well.

### 4. The trial court did not abuse its discretion under section 352.

Tooker next argues that even assuming section 1109 is constitutional, the trial court should have excluded the evidence of prior domestic violence under section 352 because it was unduly prejudicial.  He primarily relies on

18

*People v. Disa* (2016) 1 Cal.App.5th 654. In that decision, our colleagues in Division Two of this court reversed the defendant's first degree murder conviction on the basis that the trial court abused its discretion under section 352 by admitting certain evidence of prior domestic violence. (*Disa*, at pp. 658, 668.) The defendant claimed that he had accidentally killed his girlfriend by putting her in a chokehold, and the prior domestic violence involved his lying in wait for an ex-girlfriend and another man before stabbing the man several times. (*Id.* at pp. 657–658, 662–663.) *Disa* concluded that although some evidence about the prior incident was admissible, the trial court abused its discretion by not excluding the specific evidence that the defendant lay in wait and attacked when the victims were asleep, because that evidence "was at odds with [the trial court's] . . . expressed concerns" involving "the serious risk the jury would improperly use the specific facts of [the] defendant's past conduct to find premeditation and deliberation in the current matter." (*Id.* at pp. 673–674.)

Tooker states that while this case "may not present an instance of error as egregious as that in *Disa*," the probative value of the evidence at issue here was likewise "outweighed by its prejudicial impact and risk of jury confusion." He argues that similar to *Disa*, "the central questions for the jury [here] were whether [he] acted with the required mental state for each charged offense and whether his conduct was premeditated and deliberated. On those questions, the prior offense evidence was crucial and highly prejudicial because the jury likely would have concluded that . . . if [he] had previously engaged in intentional acts of domestic violence, he likely did so with the same intent on the present occasion." We see no meaningful parallels between this case and *Disa*. The previous incidents here did not involve any planning activity or otherwise suggest a deliberate intent, and in

19

any case the jury found that the attempted murder was *not* premeditated. Also, *Disa* held that evidence of the prior incident should have been limited, not excluded entirely (see *People v. Disa*, *supra*, 1 Cal.App.5th at pp. 673–674), but Tooker does not explain how the trial court here could have limited the evidence in order to address his concerns. In short, *Disa* does not support his argument.

In addition, Tooker claims that the evidence of his prior acts was especially prejudicial because he was not prosecuted for the previous incidents, so "the jurors likely concluded [he] was never adequately punished for those offenses." He also argues that the probative value of the evidence was diminished because it consisted of "more allegations of the same type of misconduct made by the same complaining witness," which did not assist "the jury in evaluating [his and M.A.'s] relative credibility." Although our state Supreme Court has stated that the probative value of uncharged conduct may be increased if there are "independent sources of evidence (the victims) in each offense" (*People v. Falsetta*, *supra*, 21 Cal.4th at p. 917), evidence of a "defendant's history of similar conduct against the same victim" admitted under section 1109 is generally "highly relevant and probative" and less inflammatory than it would be if it involved separate victims. (*People v. Hoover* (2000) 77 Cal.App.4th 1020, 1029.) And while "the prejudicial impact of the evidence is reduced if the uncharged offenses resulted in actual *convictions* and a prison term" (*Falsetta*, at p. 917), the fact that some factors may have weighed in favor of excluding the evidence does not establish error. In short, Tooker fails to convince us that the trial court abused its discretion under section 352 by admitting the challenged evidence.

5.     Tooker's claim of instructional error lacks merit.

Finally, Tooker contends that the jury instruction on the evidence admitted under section 1109 "interferes with the presumption of innocence" and "makes conviction possible without proof beyond a reasonable doubt." As he recognizes, our state Supreme Court rejected a similar claim involving CALJIC No. 2.50.01, the previous form instruction on evidence about prior sexual offenses admitted under section 1108. (*People v. Reliford* (2003) 29 Cal.4th 1007, 1012–1013.) Relying on *Reliford*, other decisions have rejected such challenges to CALJIC No. 2.50.02, the previous form instruction on evidence about prior domestic violence admitted under section 1109, as well as more recent form instructions on both sections 1108 and 1109. (E.g., *People v. Johnson* (2008) 164 Cal.App.4th 731, 738–739 [former CALCRIM No. 852]; *People v. Cromp* (2007) 153 Cal.App.4th 476, 479–480 [former CALCRIM No. 1191]; *People v. Pescador* (2004) 119 Cal.App.4th 252, 261 [CALJIC No. 2.50.02].) Because Tooker does not explain why he believes *Reliford* was wrongly decided and makes his argument "for purposes of preserving the claim for federal review," we will not consider it further.

C.     *Any Error in the Omission of a Jury Instruction on Unconsciousness Was Harmless.*

Tooker next argues that the trial court prejudicially erred by failing to instruct on unconsciousness as a defense, requiring reversal of his convictions for attempted murder, both assaults, and corporal injury. We are not persuaded.

"Unconsciousness, if not induced by voluntary intoxication, is a complete defense to a criminal charge. [Citations.] To constitute a defense, unconsciousness need not rise to the level of coma or inability to walk or perform manual movements; it can exist 'where the subject physically acts but is not, at the time, conscious of acting.' " (*People v. Halvorsen* (2007)

21

42 Cal.4th 379, 417.) A trial court has a sua sponte duty to instruct on unconsciousness "if it appears the defendant is relying on the defense, or if there is substantial evidence supporting the defense and the defense is not inconsistent with the defendant's theory of the case." (*People v. Rogers* (2006) 39 Cal.4th 826, 887.) We review de novo "a claim that a court failed to properly instruct on the applicable principles of law." (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.)

The parties agree that Tooker did not rely on the defense of unconsciousness but instead argued at trial that he suffered from a neurological issue that precluded him from forming the necessary intent. But we need not address whether substantial evidence supported an unconsciousness defense, as any error was harmless beyond a reasonable doubt because " 'the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions.' " (*People v. Wright* (2006) 40 Cal.4th 81, 98.) Although the jury found that the attempted murder was not willful, deliberate, and premeditated, it did make findings of willfulness in connection with the other five convictions. It was instructed that "[s]omeone commits an act *willfully* when he or she does it willingly or on purpose," and it found that Tooker willfully threatened to kill or cause great bodily injury to M.A., willfully stabbed her with the pruning shears, willfully strangled her, and willfully violated the court order. The conclusion that Tooker purposely performed all of these acts cannot be reconciled with the theory that he was unconscious when he attacked M.A., and any erroneous failure to instruct on unconsciousness was therefore harmless.

22

*D.    The Jury Instruction on Attempted Voluntary Manslaughter Did Not Impermissibly Shift the Burden of Proof.*

Tooker's final claim of instructional error is that the jury instruction on attempted voluntary manslaughter lightened the prosecution's burden of proof on the charge of attempted murder. We reject this claim.

The jury was instructed under CALCRIM No. 604 that "[a]n attempted killing that would otherwise be attempted murder is reduced to attempted voluntary manslaughter if the defendant attempted to kill a person because he acted in imperfect self-defense." Tooker argues that the instruction created a presumption in favor of an attempted murder verdict, because it required the jurors to convict him of that crime "unless the defense had convinced them that the attempted homicide should be 'reduced' to attempted voluntary manslaughter."

Initially, we agree with the Attorney General that Tooker forfeited this claim by failing to object below. " 'A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' " (*People v. Jennings* (2010) 50 Cal.4th 616, 671.) Tooker acknowledges that his claim is of this type, and we thus conclude he forfeited it by failing to raise it in the trial court. (See *id.* at pp. 671–672.)

Nevertheless, we address the claim on the merits to avoid addressing Tooker's related claim of ineffective assistance of counsel. " 'A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant. [Citations.]' [Citation.] ' "[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." ' " (*People v. Solomon* (2010) 49 Cal.4th 792, 822.)

23

Again, we review this claim of instructional error de novo. (*People v. Ghebretensae* (2013) 222 Cal.App.4th 741, 759.)

Here, the jury was instructed under CALCRIM No. 220 that Tooker was presumed innocent and that the prosecution had the burden to prove his guilt beyond a reasonable doubt. In addition, the challenged instruction itself provided that "[t]he People ha[d] the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense." It also stated that if the prosecution "ha[d] not met this burden, [the jury had to] find the defendant not guilty of attempted murder." Thus, read in context, CALCRIM No. 604 did not impermissibly shift the burden to Tooker to prove that he had acted in imperfect self-defense, and there is no reasonable likelihood that the jury interpreted it to do so.

In arguing otherwise, Tooker attempts to analogize the challenged instruction to the instruction at issue in *People v. Owens* (1994) 27 Cal.App.4th 1155, a case decided by Division Five of this court. *Owens* addressed a former version of CALJIC No. 10.42.6 on continuous sexual abuse of a child, which stated in part, " 'The People have introduced evidence tending to prove that there are more than three acts of substantial sexual conduct or lewd and lascivious conduct upon which a conviction . . . may be based.' " (*Owens*, at p. 1158.) Although Division Five expressed concern that the phrase "tending to prove" permitted "the inference that the People have, in fact, established guilt," it concluded that the error did not require reversal because it was not "likely to have misled the jury" in light of the other instructions given on the presumption of innocence and reasonable doubt. (*Id.* at pp. 1158–1159.) Even assuming that the references in the instructions here to an attempted killing being "reduced" could permit a similar inference,

24

*Owens* supports our conclusion that, in light of the other instructions given, the jury was not reasonably likely to have been misled.

Tooker argues that CALCRIM No. 604 also "operated in another related, but analytically different, way to [his] disadvantage" because it "likely had the effect of setting an order of deliberations for the [jurors] in that, if they were to presume the crime was attempted murder unless convinced otherwise, the logical starting point for their deliberations was on the question whether this was a case of attempted murder." He relies on *People v. Kurtzman* (1988) 46 Cal.3d 322, in which the Supreme Court held that although a jury cannot return a verdict on a lesser included offense before acquitting on a greater offense, it may deliberate on lesser offenses before reaching agreement on the greater offense. (*Id.* at pp. 324–325.) The Court concluded that a trial court's instructions in response to the jury's expressions of being deadlocked were erroneous because they informed the jury that it could not *consider* a lesser included offense before reaching a resolution on greater offenses. (*Id.* at pp. 327–328, 336.)

In contrast, the trial court here made no such comments suggesting that the jury could not deliberate on a lesser included offense before returning a verdict on the greater offense. Nor is there anything about the references in CALCRIM No. 604 to an attempted killing being "reduced" to attempted voluntary manslaughter that would suggest to the jury that it could not even deliberate on that lesser offense before agreeing on the charge of attempted murder. As a result, this aspect of Tooker's challenge to the instruction also fails.

E.    *Tooker's Claim that Section 422 Is Unconstitutionally Vague Lacks Merit.*

Under section 422, subdivision (a), it is a crime to "willfully threaten[] to commit *a crime which will result in death or great bodily injury to another*

25

*person*, with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety."  (Italics added.) Tooker claims that the italicized language renders the statute unconstitutionally vague, "because it calls upon law enforcement to evaluate the nature of threats and to determine, on a case-by-case basis, and under a myriad of circumstances, whether a threat is of the type that will result in great bodily injury or death.  Also, by linking the threat to a crime causing death or great bodily injury, it is unclear to the general public what type[s] of threats are illegal, because of uncertainties as to what threatened crimes are of the type to result in death or great bodily injury."

A penal statute violates due process and is therefore void for vagueness only if it " 'fails to provide adequate notice to those who must observe its strictures' and ' "impermissibly delegates basic policy matters to [law enforcement officers], judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." ' " (*People v. Rubalcava* (2000) 23 Cal.4th 322, 332; *People v. Maciel* (2003) 113 Cal.App.4th 679, 683 (*Maciel*).)  "A criminal statute is unconstitutionally vague on its face only if it is ' "impermissibly vague in all of its applications." ' " (*Maciel*, at p. 683, quoting *People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1116, italics omitted.)

We agree with the Attorney General that this claim fails because Tooker's "own conduct falls clearly within [section 422's] bounds."  "[A]

defendant who falls 'squarely within' the reach of a statute lacks standing to challenge its vagueness as it 'might be hypothetically applied to the conduct of others.'" (*People v. Murphy* (2001) 25 Cal.4th 136, 149, quoting *Parker v. Levy* (1974) 417 U.S. 733, 756.) If we can "give [a statute] a ' "reasonable and practical construction" ' that accords with the drafters' probable intent and encompasses the defendant's conduct," then we need not "consider every conceivable situation that might arise under [the] statute's language." (*Murphy*, at p. 149.) Here, it is clear that section 422, which prohibits threatening to commit a crime that would cause death, covered Tooker's conduct of telling M.A. that he was going to kill her. (See *Maciel*, *supra*, 113 Cal.App.4th at p. 682, fn. 2.) As a result, and because Tooker "does not argue that [section 422] improperly prohibits a substantial amount of constitutionally protected conduct, he may not challenge it on vagueness grounds." (*Murphy*, at p. 149.)

In any case, Tooker's vagueness claim fails on the merits. In *Maciel*, the Second District Court of Appeal rejected the same assertion "that [section 422's] language fails to advise individuals as to those threats proscribed and grants unfettered discretion to law enforcement to determine those statements that constitute threats." (*Maciel*, *supra*, 113 Cal.App.4th at p. 682.) The decision explained that, read in context with the other statutory language, the phrase " 'willfully threatens to commit a crime which will result in death or great bodily injury' . . . does not criminalize all threats of crimes that will result in death or great bodily injury," but instead "only serious threats, intentionally made, of crimes likely to result in immediate great bodily injury." (*Id.* at p. 685.) *Maciel* also concluded that even read in isolation, the phrase " 'crime which will result in great bodily injury' " is not vague, because it "means objectively, i.e., to a reasonable person, likely to

27

result in great bodily injury"—a term that cases have consistently found sufficiently clear—"based on all the surrounding circumstances." (*Id.* at pp. 685–686.)

Tooker offers us no good reason not to follow *Maciel*. He argues only that its holding is "suspect" because of its reliance on *State v. Schmailzl* (Neb. 1993) 502 N.W.2d 463, 466–467, a case upholding Nebraska's criminal threats statute. As does Tooker, the *Maciel* defendant relied on *State v. Hamilton* (Neb. 1983) 340 N.W.2d 397, in which the Nebraska Supreme Court invalidated an earlier version of the state's criminal threats statute that contained some language similar to that of section 422. (*Maciel*, *supra*, 113 Cal.App.4th at p. 686, fn. 3.) In a footnote following the conclusion of its vagueness analysis, *Maciel* acknowledged this similarity but noted that the earlier version of Nebraska's statute "did not include language that the victim must take the threat seriously or any intent element" and that the amended version had since been upheld in *Schmailzl*. (*Maciel*, at p. 686 & fn. 3.) This passing mention of *Schmailzl* was hardly the cornerstone of *Maciel*'s analysis; in any case, we choose to follow a California decision that is directly on point over a decades-old Nebraska case. Section 422 is not unconstitutionally vague.

F.     *Remand Is Required Under* Frahs.

Tooker argues that he is entitled to the retroactive application of section 1001.36, requiring conditional reversal of the judgment and remand for the trial court to determine whether he is eligible for mental health diversion under that statute. We agree.

A few months after Tooker was sentenced, the Legislature enacted Assembly Bill No. 1810 (2017–2018 Reg. Sess.), which created a pretrial mental health diversion program by adding section 1001.36 to the Penal

28

Code. Effective June 27, 2018, certain defendants who have a covered mental disorder and meet several other criteria under the statute are eligible for pretrial diversion. (§ 1001.36, subd. (b); Stats. 2018, ch. 34, §§ 24, 37.) Trial courts may exercise their discretion to postpone the prosecution of such defendants to permit them to undergo mental health treatment. (§ 1001.36, subds. (a) & (c); see *Frahs*, *supra*, 9 Cal.5th at p. 626.) Should a defendant perform "satisfactorily" on diversion, the charges are dismissed, and "the arrest upon which the diversion was based shall be deemed never to have occurred." (§ 1001.36, subd. (e).)

*Frahs* held that section 1001.36 applies retroactively to defendants, like Tooker, whose judgments were not yet final when it took effect. (*Frahs*, *supra*, 9 Cal.5th at p. 624; see *In re Estrada* (1965) 63 Cal.2d 740, 742.) In our prior opinion, we assumed without deciding that section 1001.36 was retroactive, but we also concluded that remand would be futile because the record showed the trial court would not have found Tooker eligible for mental health diversion even if it had been aware of its discretion to do so. Although we disagreed with the Attorney General that futility was established by the trial court's finding as an aggravated circumstance under rule 4.421(b)(1) that Tooker "engaged in violent conduct that indicates a serious danger to society," we agreed that futility was established by the court's refusal to find as a mitigating circumstance under rule 4.423(b)(2) that Tooker "was suffering from a mental or physical condition that significantly reduced culpability for the crime[s]."

*Frahs* held that "a conditional limited remand for the trial court to conduct a mental health diversion eligibility hearing is warranted when . . . the record affirmatively discloses that the defendant appears to meet at least the first threshold eligibility requirement for mental health diversion—the

29

defendant suffers from a qualifying mental disorder." (*Frahs*, *supra*, 9 Cal.5th at p. 640.) The Supreme Court then rejected the Attorney General's argument that "a remand would be pointless" because the trial court had concluded the defendant was not "suffering from a mental or physical condition that significantly reduced culpability for the crime" under rule 4.423(b)(2) (*Frahs*, at pp. 638–639)—the same argument for futility we accepted in our prior opinion. The Supreme Court declined, however, to "address the question of whether an appellate court may also decline a defendant's remand request when the record clearly indicates the trial court would have found the defendant 'pose[s] an unreasonable risk of danger to public safety' ([§ 1001.36], subd. (b)(1)(F)) and is therefore ineligible for diversion" (*id.* at p. 640)—the same argument for futility we rejected in our prior opinion.

The record contains considerable evidence about Tooker's mental health, including the experts' reports assessing his competency and a defense expert's trial testimony about his brain injury. It is undisputed that he may suffer from a qualifying mental disorder under section 1001.36, requiring remand under *Frahs* unless it would be futile. (See *Frahs*, *supra*, 9 Cal.5th at p. 640.) Tooker contends in his supplemental brief that our determination that remand would be futile because the trial court rejected a mitigating circumstance under rule 4.423(b)(2) cannot stand after *Frahs*. The Attorney General does not claim otherwise, instead renewing his argument that remand would be futile because the record shows the trial court would not be "satisfied that the defendant will not pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community," as required under section 1001.36, subdivision (b)(1)(F).

30

*Frahs* left open the possibility that remand might be futile where the record "clearly indicates" the trial court would find the defendant ineligible for mental health diversion because he or she poses an unreasonable risk of danger to public safety. (*Frahs, supra,* 9 Cal.5th at p. 640.) But nothing in that decision leads us to reach a different conclusion on this issue. As we discussed in our prior opinion, an "unreasonable risk of danger to public safety" under section 1170.18 is a higher standard than "a serious danger to society" under rule 4.421(b)(1), because the former phrase is narrowly defined "as the likelihood a defendant will commit a new violent felony within the meaning of section 667, subdivision (e)(2)(C)(iv)," which in turn " 'enumerates a narrow list of super-strike offenses such as murder, rape[,] and child molestation' "—but not attempted murder or any of the other crimes of which Tooker was convicted. (*People v. Burns* (2020) 38 Cal.App.5th 776, 789, review granted Oct. 30, 2019, review dismissed July 29, 2020, S257738); see § 1170.18, subd. (c).) Moreover, under section 1001.36, subdivision (b)(1)(F), a trial court must evaluate the defendant's risk of dangerousness while undergoing mental health treatment, whereas rule 4.421(b)(1) does not account for measures that could be taken to reduce the defendant's dangerousness. (See *Burns,* at p. 789.) Thus, the trial court's finding that Tooker's behavior indicated a serious danger to society does not conclusively establish that the court would find him ineligible for diversion.

The Attorney General points out that the trial court also found other aggravating circumstances suggesting it would conclude that Tooker poses an unreasonable risk of danger to public safety. These include the findings that Tooker "committed acts disclosing a high degree of cruelty, used a weapon, committed his crime against a particularly vulnerable victim, threatened the victim, and carried out his crime in a way that indicated planning." We agree

31

that these findings in the context of the record as a whole suggest that the court is not likely to exercise its discretion to place Tooker on mental health diversion. Nevertheless, because we cannot say that any of these findings categorically rule out Tooker's eligibility for diversion, we conclude that remand is required under *Frahs* for the court to decide the issue in the first instance.

G.    *Tooker May Raise His Ability-to-pay Claim on Remand.*

Without objection by Tooker, the trial court imposed a $240 court operations assessment under section 1465.8, subdivision (a), a $180 criminal conviction assessment under Government Code section 70373, and a $300 restitution fine under section 1202.4, subdivision (b). Relying on *Dueñas*, which concerned the same three charges (*People v. Dueñas*, *supra*, 30 Cal.App.5th at p. 1162), Tooker now contends that the assessments must be stricken and the fine must be stayed unless and until the court finds he is able to pay. Since remand is already required for the court to determine whether to grant mental health diversion, we do not decide this claim and instead conclude that he may raise it in the first instance on remand.[10]

## III.
### DISPOSITION

The judgment is conditionally reversed, and the matter is remanded to the trial court with directions to conduct a mental health diversion eligibility hearing under section 1001.36. " 'If the trial court finds that [Tooker] . . . meets the six statutory criteria (as nearly as possible given the postconviction procedural posture of this case), then the court may grant diversion. If [he]

---

[10] We gave the parties an opportunity to submit supplemental briefing on whether we should still decide the ability-to-pay claim even if we concluded remand was required under *Frahs*, and neither did so.

successfully completes diversion, then the court shall dismiss the charges. However, if the court determines that [Tooker] does not meet the criteria under section 1001.36, or if [he] does not successfully complete diversion, then his convictions and sentence shall be reinstated' " (*Frahs*, *supra*, 9 Cal.5th at pp. 640–641), with the exception that he may challenge the imposed fines and fees on the basis that he lacks the ability to pay them.

_____

Humes, P.J.

WE CONCUR:



_____

Margulies, J.



_____

Sanchez, J.

*People v. Tooker*  A154181